ALBERT HARRAH, APPELLANT, V. EDGAR C. SMITH ET AL.,
APPELLEES.

FILED MAY 10, 1907.   No. 14,789.

1. Mortgages: CONVEYANCES: CONSIDERATION.   Whether a conveyance
absolute in form is intended as an unconditional conveyance or
as a security must be determined by a consideration of the pecu-
liar circumstances of each case.   Where the parties sustain the
relation of debtor and creditor, and the grantee surrenders to the
grantor the evidence of indebtedness held against him to the
full amount of the consideration for such conveyance, and such
indebtedness is understood by the parties to be fully paid and
satisfied thereby, the transaction will in the absence of fraud be
regarded as an unconditional conveyance.

2. ———: ———: ESTOPPEL.   Evidence examined, and *held* not suffi-
cient to estop the defendant from asserting his absolute title to
the property in controversy.

APPEAL from the district court for Lancaster county:
ALBERT J. CORNISH, JUDGE.   *Affirmed.*

*G. W. Berge* and *W. A. Spurrier,* for appellant.

*Smyth & Smith, contra.*

DUFFIE, C.

This action was brought by Harrah to redeem the prop-
erty known as the "Brownell Block," in the city of Lin-
coln, from an alleged mortgage held thereon by the de-
fendant Smith.   The district court, after a lengthy trial,
entered a decree dismissing the plaintiff's bill, and the
plaintiff has appealed to this court.

The facts surrounding the transaction are contained in
a bill of exceptions covering about 1,200 pages, and,
while the circumstances attending the numerous trans-
actions are somewhat complicated, the material facts
which must govern in determining the case are neither
numerous nor difficult of understanding.   During the
transactions which we shall now proceed to examine,

Smith, the defendant, had charge of the business of the New York Life Insurance Company in the state of Nebraska, his official title being "agency director." One H. O. Jackson was a successful insurance solicitor, and some time in 1901 Smith procured his services for the company which he represented. It is not in controversy that Jackson was successful in his business of life insurance, earning in commissions from $500 to $1,000 a month, and during his employment with the New York Life Insurance Company, covering a period of about three years, numerous transactions of a financial character took place between him and the defendant. He owned a ranch of 2,000 acres in Holt county, Nebraska, and his business as a ranchman was not apparently as successful as in that of soliciting life insurance. At any rate, he became indebted to Smith in a sum aggregating $19,000 or $20,000, for which Smith held mortgages on the ranch and stock. There were other liens amounting to about $8,000 held by other parties on the ranch property, and in 1901 Jackson was negotiating with the plaintiff, who lived in Iowa, for the purchase of $15,000 worth of graded cattle. He approached Smith, suggesting a loan of the cash payment to be made upon the cattle, which Smith refused, telling him at the same time that he could not make a success in breeding fine cattle, and that it would lead him into further financial difficulties. Notwithstanding this, he made the purchase, and the evidence tends to show that this greatly increased the financial difficulties under which he was laboring. Some time after this, and in the summer of 1902, desiring to get rid of his ranch, Jackson entered into negotiations with Hardin & Disney looking to a trade of his ranch property in exchange for the Brownell Block in Lincoln, of which they were the owners. Hardin & Disney would not trade for the ranch unless all liens existing against it were paid and discharged, and an agreement was finally made, by the terms of which Jackson agreed to discharge the liens against his ranch and to transfer it to Hardin & Disney

for the Brownell Block, which was also to be clear of all liens. Thereupon Jackson commenced negotiations with different parties to raise money to discharge the liens existing on his ranch. He applied to Smith to release his liens on the ranch property and take a mortgage for the amount upon the Brownell Block. This Smith refused to do or to advance him more money, but insisted that a portion of the amount then due him should be paid. Finally an arrangement was entered into between Jackson and the defendant by which Smith was to advance money enough to discharge the liens held by third parties on the ranch and to take a deed in his own name for the Brownell Block, one object of this arrangement apparently being to allow Smith to obtain a loan upon the block, Jackson's application for a loan having been refused by those to whom he had made application. The evidence of both these parties is to the effect that Smith considered the block worth not to exceed $28,000, while Jackson regarded it as of much greater value. The trade was completed October 16, 1902; the deed for the Brownell Block, at Jackson's request, being made to Smith, and on that or a later date Smith made and delivered to Jackson what the parties have denominated an "agency agreement," which is in the following words: "Omaha, Neb., October 16, 1902. Mr. H. O. Jackson, City. Dear Sir: You are hereby authorized and commissioned, as my sole agent, to sell for me, any time within twelve months from this date, lots C and D and the south two feet of lot B, of Cropsey's subdivision of lots 16, 17 and 18 of block fifty-five, city of Lincoln, Nebraska, commonly known as the 'Brownell block'; provided, however, that the net proceeds to me of the sale shall amount to $28,000, and interest thereon at the rate of eight per cent. per annum from October 16, 1902, and, in addition thereto, such sum or sums of money as you may be owing to me at the date of such sale. If said block is not sold within sixty days, I will endeavor to get a loan on it, to the best advantage possible, and whatever I am able to save in interest below

eight per cent., after deducting all costs and expenses incurred in procuring the loan, shall be allowed to you as additional commissions when you consummate the cash sale, in accordance with provisions above. If the net income from rent of said block, after deducting all costs and expenses for taxes, repairs, improvements, insurance or any other expenditures incurred in managing or caring for said property, exceeds the interest on the purchase price of said building, viz., $28,000, I agree to allow you such excess, as a bonus commission, when you become entitled to other commissions by reason of making the sale. If a cash sale is consummated by you, in compliance with the provisions above, I agree to furnish a good, special warranty deed, running to such party or parties as you may designate. (Signed) Edgar C. Smith. Accepted. H. O. Jackson."

On June 27, 1903, Jackson surrendered his agency agreement, writing across the face thereof the following: "My agency for sale of this block, Brownell block, is hereby canceled and terminated," and on the same date he executed and delivered to Smith the following: "Dear Sir: In consideration of your canceling and surrendering to me two promissory notes given to you for money loaned me, one for $1,000, dated January 4, 1901, bearing 8 per cent. and secured by a chattel mortgage on furniture; and one for $2,000, dated October 18, 1902, bearing 8 per cent., and the receipt from you in full for the book account you have against me of $1,044.14 for cash advanced and policies delivered, I hereby relinquish all interest or claim of every nature I hold or ever had in the Brownell Block by reason of the agency you gave me to sell said building, or otherwise, the said agency being hereby canceled and forever terminated from this date. H. O. Jackson. Witness: W. D. Reily."

Another transaction will now have to be explained in order to show the facts relating to the plaintiff's claim to an interest in the Brownell Block. At the time the trade for said block was consummated, Jackson was still

owing the plaintiff $9,000, with interest, on the purchase of the cattle made in 1901, and he procured Jackson to be indicted in the district court for Jasper county, Iowa, on the charge of obtaining property under false pretenses, claiming that Jackson, in order to obtain credit on his purchase of the cattle, represented to him that he was a man of means, while in truth and fact he was wholly insolvent. Jackson was arrested and taken to Iowa, and, on the solicitation of Mrs. Jackson, Smith deposited with the clerk of the court where the indictment was pending $2,500 in cash as bail for Jackson. On the trial Jackson was acquitted of the charge, but in the meantime Harrah had commenced an action against Jackson in the district court for Douglas county, Nebraska, and attached the Brownell Block, and this action was pending at the time of the trial of the criminal case in Iowa. Harrah had also attached or garnisheed the $2,500 bail money deposited in Iowa, claiming that it belonged to Jackson. After Jackson's acquittal on the criminal charge, he had some information leading him to believe that Harrah had endeavored to use unfair means to procure his conviction and he filed a counterclaim in the suit brought against him by Harrah in Douglas county, asking judgment for $25,000 for malicious prosecution, and a large sum for misrepresenting the condition of the cattle purchased. Sometime thereafter this case was settled, Harrah surrendering to Jackson all evidences of indebtedness held against him, and Jackson dismissing his counterclaim for malicious prosecution and other damages claimed. As a part of that settlement Jackson and wife quitclaimed to Harrah any interest held by them in the Brownell Block, Jackson having theretofore made a written statement to the effect that at the time the Brownell Block was conveyed to Smith it was agreed between them that Smith should hold the block as security for the amount owing him by Jackson, and that whenever he could pay him $28,000 he would deed the block to Jackson or to any person that he might designate. The quitclaim deed from

Jackson and wife to Harrah bears date March 14, 1904,
and Harrah now claims, and this action is based upon the
theory, that Smith took title to the property as security
only for $28,000 due him from Jackson and for such other
sums as have since been advanced, and that Jackson's
quitclaim deed vests in Harrah the right to redeem from
that mortgage. There are two letters written by Smith
to Jackson during the life of the "agency agreement,"
which plaintiff insists have a bearing on the case, and
which tend to show that Smith held the block, not by ab-
solute title, but by way of security only. One, under date
of March 9, 1903, contains the following: "Write me what
you have said to Hohn. Of course, I want my money
out of it, and you want your commission in cash for sell-
ing it. Did you intimate to him that there would be any
deed given, and what is the least price you think he
better take it for? Write the least you would recom-
mend it being sold for." Another, under date of March
11, 1903, contains the following: "This afternoon I re-
ceived $20,000 on account of loan, and sent $10,000 to
Waterbury National Bank that I borrowed of Uncle Mark,
and the other I used at bank here. They charged in-
terest from March 2, the date they sent it from Milwau-
kee, but Ambler had held it waiting to get answers to
telegrams from different states, from Hardin & Parsons,
and from Des Moines, as to whether any bankruptcy pro-
ceedings had been commenced against them or me, and it
has taken time; but Ambler says they charge interest
from the time the drafts leave their office, so I suppose
we will have to stand it. There will be ten days lost in-
terest." This paragraph of the letter refers to a loan made
by Smith on the Brownell Block from the Northwestern
Life Insurance Company.

These are the principal features in the case, and, to-
gether with the oral testimony which will be considered
as we proceed, sufficient for understanding our views of
the controversy without reciting many immaterial facts
and circumstances that have no real bearing on the rights

of the parties. It is insisted by the plaintiff that the docu-
mentary evidence is alone sufficient, not only to justify,
but to require from the court a holding that Smith's in-
terest in the Brownell Block is that of a mortgagee, and
that an account should be taken, and the amount due him
from Jackson ascertained, and the plaintiff allowed to
redeem. The evidence shows without conflict that at the
time Smith took title to the property Jackson was owing
him $27,000 or $28,000. Smith's evidence that he valued
the block at $28,000, and no more, is not disputed. It is
also shown that Jackson placed a much higher value on
the property. That Smith desired to realize part, at
least, of the amount that Jackson was owing him is
evident, and he thought that he might, as he afterwards
did, secure a loan upon the property by which he could
realize $20,000 or more. Under these circumstances, it
is not unreasonable that Smith should insist upon taking
absolute title to himself in order that he might effect a
loan, or that Jackson should insist that he should have
an opportunity to realize from the property something
more than the $28,000 which Smith had invested. The
reasonable way to accomplish these objects was the one
adopted by the parties, giving Jackson a reasonable time
in which to make a sale of the property or to repurchase it
by paying to Smith the amount he had invested therein,
together with interest and any additional sums due from
Jackson at the time. Jackson was paying 8 per cent. in-
terest on his loans from Smith, and the agency agreement
very fairly provided that, if no sale of the property was
made within 60 days, then Smith would endeavor to get
a loan on it at the lowest rate of interest possible, and
allow Jackson the benefit of any reduced interest on the
amount of the loan in case of a sale. The agreement
further provided, in the interest of Jackson, that, if the
net income from the rent of the block exceeded the in-
terest on the purchase price, Jackson should be allowed
the benefit of such excess. If, as contended by Smith,
this agreement was purely an agreement for commissions

for the sale of the property, or a conditional sale thereof, it was in all matters as fair to a party occupying the position of Jackson as could be drawn. Realizing to the full extent that, where a transaction of this character leaves it doubtful whether it should be construed as a security or as an absolutely unconditional sale, the debtor should have the benefit of such doubt, there is one circumstance which relieves the transaction of any doubt whatever. When Smith took title to this property, he surrendered to Jackson $28,000 of the indebtedness due him. There is one principle. which is axiomatic in the law of mortgages, which is, that the relation of mortgagor and mortgagee cannot exist in the absence of a debt. In *Riley v. Starr*, 48 Neb. 243, it was said: "The true test in determining whether a conveyance absolute in form should be treated as a sale or as a mortgage is whether the relation of the parties toward each other as debtor and creditor continues. If it does so continue, the transaction will be treated as a mortgage and the conveyance as a security only." In this case the indebtedness did not continue. The evidence without dispute shows that Smith surrendered his entire indebtedness from Jackson on taking this deed. Jackson himself testified that "he surrendered everything to me; Yes, sir, I can't remember the different notes, Mr. Smyth, I can't remember that, but I know it was evidence of indebtedness to the amount of $28,000. He canceled that entire debt against me." He further testified that it was understood between them that, so far as the $28,000 was concerned, he ceased to owe Smith a penny of it and that he had been fully paid.

How it can be claimed that property taken in full payment of a debt should still stand as security for that debt has not been explained to our satisfaction. The letters of Smith above referred to were written while the agency agreement was still in force, and while Jackson had such interest in the property as the agency agreement allowed him. Aside from this, when the agency agreement was made, Mr. Baird, a reputable attorney of Omaha, was

called upon to determine whether Jackson's rights would be fully protected by its terms. He examined it in the presence of the parties, and, after full explanation of their agreement, suggested that the word "sole" be inserted before the word "agent," making Jackson the sole agent to sell the property for one year. His testimony is undisputed that the conversation between the parties at the time was to the effect that Smith was taking title absolute to the property, and that the only interest Jackson had therein was the right to sell within a year under the terms and conditions provided in the agreement. His testimony is corroborated by other witnesses, and is undisputed, except by such inferences as may be drawn from the documents above set out. It is true that in a written statement made prior to his quitclaim deed to Harrah, Jackson had given a different version of the transaction, but his deposition was taken by the plaintiff, and he testified that all of his indebtedness to Smith was surrendered, that he fully understood the transaction, and this is conclusive that he could thereafter have no interest in the property as mortgagor. This disposes of the principal question in the case, and eliminates many of the collateral questions raised in the briefs of the parties.

It being, as we think, fully established by the testimony offered by the plaintiff himself that Jackson had no interest in the property except such as he acquired by what is known as the agency agreement, it follows that, when in June, 1903, he surrendered for a valuable consideration all rights under that agreement, he ceased to have any interest whatever, and the plaintiff's rights, if any he has, depend wholly upon the question of estoppel raised by his pleadings. Relating to this question, it may be said that plaintiff claims that at the time he took his quitclaim deed from Jackson he was led to believe from statements made by the defendant that Jackson was a mortgagor having the right to redeem the property upon payment of whatever might be due to Smith from Jackson. The evidence to support this claim arises principally from the fol-

lowing facts: Some time in May, 1903, the attorneys of Jackson and Harrah met in Omaha to effect a settlement of the litigation there pending between them. They called upon Smith, and wanted to know if he would transfer the block to Mr. Harrah, provided they could fix up a settlement with him regarding Harrah's claim against Jackson. He told them that he would under the agency agreement giving him the right to sell the property. They wanted to know how much approximately there was that Jackson owed outside of the purchase price of the building, and Smith figured up the amount due at the time, but no further proceedings were had in relation to the matter, and Smith that evening went to Colorado. This was on the day that the block took fire, and shortly after his arrival in Colorado Smith received a telegram to the effect that the parties would have nothing further to do with the building. It will be borne in mind that this conversation, which Smith himself relates, was during the life of the agency agreement, and that by the terms of that agreement Smith was legally bound to convey to anyone whom Jackson might designate when the terms thereof were complied with. Some other conversations are referred to in which Smith manifested a willingness to convey the block upon payment of the amount invested therein and the further sums due from Jackson, but these were all during the life of the agency agreement, and his offers were nothing more nor less than an expressed willingness to comply therewith. Smith was a witness for the state in the criminal action brought against Jackson in Iowa. On cross examination he was asked the following question: "Mr. Smith, it was the understanding between you and Mr. Jackson, wasn't it, at the time the title of this building or the building itself was transferred to you, that you took it to secure your indebtedness, and that you were willing to give him the difference between what your indebtedness was and whatever sum he might sell the building for?" He answered: "Yes, sir." It will be observed that the question embraces other elements than that of his holding

title to the building as security for Jackson's debt, and, while his answer might very well be construed to mean that he took title absolute to secure himself from loss against Jackson's indebtedness, still, if it be construed that he held as mortgagee only, his direct examination was plain and explicit to the effect that he held by absolute title and claimed to be absolute owner. Harrah himself testified as follows: "Q. So that your final interview with him in your brother's office with respect to this matter satisfied you that he was the absolute and unqualified owner of this property? A. Yes, sir. Q. That Jackson had no interest in it at all? A. None whatever. Q. And you believed that fully and unqualifiedly at that time, didn't you? A. Yes, sir; I did." We have searched the record in vain for any fact or circumstance which would justify Mr. Harrah in changing the opinion which he says he had regarding the ownership of the block at the time he had the conversation with Smith referred to in the questions quoted, and we are unable to find anything in the record upon which an estoppel to Smith's present claim of ownership can be predicated. In conclusion, we might say that it is only the zeal and ability of the plaintiff's counsel in the presentation of the case that would cast even a doubt upon Smith's absolute title and his entire fairness in all the transactions concerning this case.

To our minds the facts are so strongly in favor of the decree of the district court that we have no hesitation whatever in recommending its affirmance.

By the Court: For the reasons stated in the foregoing opinion, the decree of the district court is

AFFIRMED.